WILLIAM J. SERGEANT, appellee-cross-appellant, v. WATSON BROS. TRANSPORTATION COMPANY, INC., appellant.

No. 47966.

(Reported in 52 N.W.2d 86)

MARCH 4, 1952.

ORDER of JULY 28, 1952, for rehearing (granted on Count I), set aside by ORDER of DECEMBER 31, 1952.

Miller, Davis, Hise & Howland, of Des Moines, and Loyal G. Kaplan and Kennedy, Holland, Delacy & Svoboda, all of Omaha, Nebraska, for appellant.

Ralph L. Powers and Joseph Z. Marks, both of Des Moines, for appellee-cross-appellant.

HAYS, J.—Action at law for damages. The petition containing four counts in effect alleges four distinct causes of action, all of them, however, arising out of the same general transaction. Count I is for false imprisonment; Count II, malicious prosecution; Count III, damage to plaintiff's over-the-road tractor; and Count IV, conversion of plaintiff's automobile. Both actual and exemplary damages are asked under Counts I, II and IV. There was a verdict and judgment for plaintiff on Counts I, II and IV, and for defendant on Count III. Both parties have appealed. Hereinafter plaintiff will be referred to as appellee; defendant as appellant.

Appellant is a Nebraska corporation authorized to do business in the state of Iowa, with its principal office in Omaha, Nebraska. Fay V. Watson is president and William Wolfe vice-president of appellant corporation, and both reside in Omaha. Appellant maintains a branch or terminal office in Des Moines, Iowa. Commencing July 5, 1949, F. L. O'Brien became the Des Moines terminal manager succeeding Jack Watson in that position. Appellant operates a number of trucks and maintained a garage and repair shop in Des Moines. Due to the quantity of oil and grease used, it had a contract with the Cushman-Wilson Oil Company of Des Moines whereby it received a discount on the purchase of such articles from said oil company.

Appellee was a resident of Des Moines, and during the time in question was employed by appellant as a mechanic and shop foreman at the Des Moines terminal. As such he had authority to purchase needed supplies for the company, including oil and grease from the Cushman-Wilson Oil Company. In 1948 appellee, under what appears to be a secret arrangement with a salesman for Cushman-Wilson Company, started ordering oil, listed as "Watson Bros. Transportation Co. and Bill Sergeant." The oil would be delivered to appellant's garage and then sold and delivered by appellee to a W. C. Rose who operated a Standard Service Station. Eight barrels of oil were sold to Rose, at least two of which were ordered in the name of Watson Bros. Transportation Co. and charged to its account. The others were apparently paid for in cash by appellee, payment being made to the salesman. Prior to March 1949 these transactions were unknown to both appellant and the oil company. Early in the

spring of 1949, appellee requested that the oil company pay him the contract discount on the oil he had purchased and sold to Rose, being five or six barrels. Following this request from appellee, Cushman-Wilson Company wrote appellant Exhibit C, which is a letter, in which inquiry was made as to the basis of appellee's request for a discount. A copy was sent to appellee. On March 8, 1949, a Mr. B. A. Fowler, employed in appellant's Accounts Payable Department, wrote a letter (Exhibit B) to appellee. This letter was in part as follows:

"We cannot understand why you are attempting to secure discounts for oil which belongs to this company under our contract, nor can I follow them when they state that you purchased six drums during the year, but apparently only two of them were purchased in your name. I want your complete and full explanation as to the disposition of all oil purchased by you on our contract by return mail."

Appellee testified that he answered Exihibit B by letter, Exhibit F, and also talked with him on the phone about March 12, 1949. He told Fowler of the manner in which he had handled the oil. Fowler testified that after receiving Exhibit F he talked with appellee on the phone. He told him that under no circumstances was he in any manner to mix his personal business with that of Watson Bros. Appellee told him he had stopped. The above facts were told to William Wolfe but not to Fay Watson.

On July 5, 1949, F. L. O'Brien became the Des Moines terminal manager and made an investigation in reference to oil purchased from Cushman-Wilson Oil Company, as it appeared as though an excessive amount of oil was being purchased. On the night of July 25, 1949, he saw a 55-gallon drum of Delvac oil (being the brand used and purchased by appellant from Cushman-Wilson Company) at the Rose service station. He knew Cushman-Wilson did not sell to Standard stations. Rose told him he bought it from Bill Sergeant (appellee). O'Brien called Fay Watson at Omaha and advised him of the situation. At Watson's request, he called appellee at his home in Des Moines at about 11 p.m. July 26, 1949, and asked him to come to the office at once, which he did. When he arrived at the office O'Brien called Fay Watson at Omaha, told him Sergeant was there, and

then followed a conversation between Watson and Sergeant. After this phone conversation, appellee signed a statement which reads as follows: "7/26/49. I, B. Sergeant, hereby admit stealing four barrels of oil and sold them to Bill Rose. (Sgd.) Bill Sergeant." It was at Watson's request that appellee gave O'Brien the above written statement.

Fay Watson's office hours were 2 p.m. to 3 a.m. At his request appellee went at once to Omaha, arriving at appellant's office about 2:30 a.m. There was a discussion which continued until about 4 a.m., at which time Watson told appellee to go to a hotel and to return to the office that afternoon. Upon his return he met with Watson and Wolfe, who had been informed of the situation by Watson. After more heated discussion, appellee signed Exhibit D, which reads: "I, Wm. Sergeant, hereby admit theft of 4 barrels of oil from Watson Bros. Shop, located on Southwest Fifth Street, Des Moines, Iowa. The oil was sold by me to William Rose of Des Moines, Iowa. (Sgd.) Wm. Sergeant."

Thereafter, at Wolfe's suggestion, the Omaha Police Department was called and soon two detectives arrived. Exhibit D was shown to them and appellee was taken to the city jail. On the morning of July 28, 1949, he was taken to the police inspector's office. No charges had been filed. Two Des Moines detectives were in the office. One of them, Mr. Antrim, asked him if he "wanted to go back to Des Moines" and he said "yes." He signed an extradition waiver and returned to Des Moines, arriving about 12:30 p.m. He was placed in jail until about 4 p.m., when he talked with detectives Beardsley, one of the two who were in Omaha, and E. V. Skain. Exhibit E was signed at this time by appellee. This is a statement in question-and-answer form and is to the same effect as Exhibit D.

Skain filed an information (Exhibit A) in the Des Moines Municipal Court, charging appellee with embezzlement in violation of chapter 710, Code of 1946, and appellee was released on a $500 bond. On August 4, 1949, after a hearing, appellee was held to the grand jury and released on his own recognizance. Thereafter the case was dismissed by the grand jury.

The above facts are not in dispute. The record further shows the following matters: Appellee testified that in the conversation

with Watson by phone, on July 26, 1949, he was threatened with immediate arrest unless he signed the statement given to O'Brien; that it was signed through fear. During the conversation with Watson and Wolfe on the 27th he was cursed, threatened with arrest and even death if he did not admit the theft and sign Exhibit D, which he finally did; that before he was allowed to consult an attorney upon arriving in Des Moines, he was required to sign Exhibit E. He stated he knew at least two weeks prior to July 26, 1949, the last two barrels of oil sold to Rose had been charged to appellant and he had not offered to pay for them at that time. He further stated, as to the signing of Exhibit D: "I felt he may have been correct when he said that buying in accordance with my deal with Cushman-Wilson may have been the same as stealing." Also: "After he accused me of stealing the four barrels of oil, I figured that after he said it was stealing on using the contract, it was stealing. I signed the paper there."

Fay Watson denies that any threats or force were used, as does Wolfe also as to the July 27th conversation, but does not deny cursing him.

Count II is based upon a malicious prosecution:

"Malicious prosecution is an action ex delicto for the recovery of damages which have proximately resulted to person, property, or reputation from a previous unsuccessful civil or criminal proceeding, which was prosecuted without probable cause and with malice." 54 C. J. S., Malicious Prosecution, section 1.

In an action of this type the burden rests upon the plaintiff to establish each and all of the following propositions before being entitled to a recovery, to wit: (1) He was prosecuted in a criminal proceedings (2) defendant instigated such prosecution (3) the prosecution terminated favorably to the accused (4) defendant acted without probable cause (5) defendant acted with malice, and (6) damages. Schnathorst v. Williams, 240 Iowa 561, 36 N.W.2d 739, 10 A. L. R.2d 1199; Minard v. Boss Hotels Co., 241 Iowa 606, 40 N.W.2d 276. The prosecution contemplated here is a proceeding of a judicial character. 54 C. J. S., Malicious

Prosecution, section 5. Probable cause, as herein used, means " 'the knowledge by the prosecuting witness of such a state of facts as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that the person accused is guilty.' " Bair v. Schultz, 227 Iowa 193, 200, 288 N.W. 119, 122. See also Weisz v. Moore, 222 Iowa 492, 265 N.W. 606, 269 N.W. 443. To instigate the prosecution means that the party against whom damages are sought was the proximate and efficient cause of maliciously putting the law in motion. As stated in Restatement of the Law, Torts, section 653, comment g:

"In order to charge a private person with responsibility for the initiation [instigating] of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated expressed by direction, request, or pressure of any kind was the determining factor in the official's decision to commence the prosecution or that the information furnished by him upon which the official acted was known to be false."

See also Minard v. Boss Hotels Co., supra.

Malice, as used herein, may be actual or inferred and may be inferred from a want of probable cause. Connelly v. White, 122 Iowa 391, 98 N.W. 144; Richmond v. Whitaker, 218 Iowa 606, 255 N.W. 681. Malice means any wrongful act which has been willfully and purposely done to the injury of another. As stated in Gripp v. Crittenden, 223 Iowa 240, 271 N.W. 599, if one makes use of the criminal law for some private purpose and not to vindicate the law such proceeding will be considered malicious.

II. Appellant assigns as error the overruling of its motion for a directed verdict and for judgment notwithstanding the verdict, under Count II.

This of necessity requires an examination of the entire factual situation which is the reason for the lengthy statement of facts above set forth. It appears conclusively that a criminal prosecution was commenced in the municipal court in Des Moines on July 28, 1949 (Exhibit A), and that it was later dismissed by the grand jury. Also, the record shows damages as claimed by appellee. Thus, three propositions remain to be established

194

by appellee in order to entitle him to have the matter submitted to a jury: (1) want of probable cause (2) malice, and (3) instigation by appellant.

■ III. Want of probable cause, while ordinarily a jury question, presents a mixed law and fact issue. Law, as to the sufficiency of the proffered evidence, assuming the truth thereof, is for the court to determine. Fact, as to the credibility to be given to such evidence, is for the jury. Shaul v. Brown, 28 Iowa 37, 4 Am. Rep. 151; Dickson v. Young, 208 Iowa 1, 221 N.W. 820; Hepker v. Schmickle, 209 Iowa 744, 229 N.W. 177; Erb v. German-American Ins. Co., 112 Iowa 357, 83 N.W. 1053. Where there is no conflict in the evidence or where but one conclusion may reasonably be reached therefrom, the court must determine same. Granteer v. Thompson, 203 Iowa 127, 208 N.W. 497.

The criminal charge was embezzlement under chapter 710, Code of 1946. Section 710.5 provides: "Embezzlement by agents. If any * * * agent * * * of any corporation * * * embezzles or fraudulently converts to his own use, or takes and secretes with intent to embezzle or convert to his own use, without the consent of his employer, master, or the owner of the money or property collected or received, any money or property of another * * * which has come to his possession or under his care in any manner whatsoever, he is guilty of larceny."

The prosecution was not commenced until the information was filed in the Des Moines Municipal Court on July 28, 1949. 54 C. J. S., Malicious Prosecution, section 5, and all facts known to appellant prior to that date may be considered upon the question of want of probable cause, Dickson v. Young, 199 Iowa 589, 200 N.W. 210, although the termination of the prosecution favorable to accused makes a prima-facie showing of want of probable cause. Richmond v. Whitaker, 218 Iowa 606, 255 N.W. 681.

■■ The record here, as above set forth, shows: Wolfe was the one who suggested and did call in the Omaha detectives, which started the subsequent proceedings. He knew of the buying and selling of oil by the appellee prior to March 1949. He knew of the correspondence and conversations between Fowler and appellee in March; that orders to cease such acts were issued to appellee and that he had stated they were stopped. He knew

that on July 25, 1949, oil from their garage was found in the possession of Rose who stated he bought it from appellee. He knew that appellee had given O'Brien a signed statement to the effect that he had taken the oil and sold it. He knew appellee had signed Exhibit D and he knew that the oil in question was charged to appellant.

Appellee contends that since the so-called confessions, or admissions, were obtained by threats and force they cannot be considered upon this question. Appellee's own statement relative thereto is: "I felt he may have been correct when he said that buying in accordance with my deal with Cushman-Wilson may have been the same as stealing", and again, "After he accused me of stealing the four barrels of oil, I figured that after he said it was stealing on using the contract, it was stealing. I signed the paper there." Assuming force and threats were used, it is significant that at no time does he deny the taking of the oil from the garage, selling it to Rose, collecting the money for the same and making no effort to pay therefor until after he was grilled by O'Brien, Watson and Wolfe. All of this was after the correspondence and orders by Fowler in March preceding.

Assuming, as alleged by appellee, that appellant's agents, Watson and Wolfe, instigated the proceedings in the municipal court on July 28, 1949, we are satisfied that under the known facts the action taken was such as a reasonable and prudent person would reasonably take, based upon a reasonable and honest belief as to the guilt of the appellee, and constituted probable cause for so acting. The motion for a directed verdict and for a judgment notwithstanding the verdict should have been sustained, and in failing to do so the court committed error.

While perhaps unnecessary, in view of our holding on the question of want of probable cause we wish briefly to comment as to the existence of malice. The record shows the following undisputed facts: Wolfe said he thought the law should take its course and called the Omaha detectives in spite of appellee's offer then to pay for the oil; also in spite of Watson's suggestion that appellee be given another chance.

Appellant contends that the proceeding was instigated by detective Skain when he filed the information on July 28, 1949. If this view is accepted, then it appears without dispute in the

record that Skain had no contact of any kind with any employee of the appellant company, and knew nothing about the case except what was stated in Exhibit E. Appellee makes no claim that this statement was procured by force or threats. However, we think the instigation of the proceedings must be held to have been in Omaha on July 27, 1949.

IV. Count I alleges false imprisonment. False imprisonment is the unlawful restraint of an individual's personal liberty or freedom of locomotion. 35 C. J. S., False Imprisonment, section 1; Fox v. McCurnin, 205 Iowa 752, 218 N.W. 499; 22 Am. Jur., False Imprisonment, section 2. In 1 Restatement, Torts, section 35, false imprisonment is defined as:

"An act which, directly or indirectly, is a legal cause of a confinement of another within boundaries fixed by the actor for any time, no matter how short in duration, makes the actor liable to the other irrespective of whether harm is caused to any legally protected interest of the other, if (a) the act is intended so to confine the other or a third person, and (b) the other is conscious of the confinement, and (c) the confinement is not consented to by the other, and (d) the confinement is not otherwise privileged."

In Fox v. McCurnin, supra, at page 757 of 205 Iowa, quoting from 3 Blackstone's Commentaries (2d Ed.) 127, it is said: " 'Every confinement of the person is an imprisonment, whether it be in a common prison, or in a private house, or in the stocks, or even by forcibly detaining one in the public streets.' " Further, at page 759 it is said: "* * * where the officer acts without a warrant, the burden of proof is upon him to justify his action. * * * and, if such [imprisonment] existed, and the imprisonment was brought about by the acts and conduct, or at the instance and request, of the defendant, McCurnin [who was not an officer], he would be liable therefor."

The essential elements of the action are: (1) Detention or restraint against one's will and (2) the unlawfulness of such detention or restraint. The good faith of the actor is no justification, Maxwell v. Maxwell, 189 Iowa 7, 177 N.W. 541, 10 A. L. R. 482, nor is the want of probable cause an essential element, as in the case of a malicious prosecution. As to the termination of

the prosecution this is not essential. As stated in annotation 25 A. L. R. 1519:

"No one can recover damages for a legal arrest and conviction; therefore, in cases of malicious prosecution it becomes necessary to await the final determination of the action. But the same principle does not apply to an action for false imprisonment, as the form of action is based upon an illegal arrest, and no matter ex post facto can legalize an act which was illegal at the time it was done."

Appellee, in his petition, alleges the false imprisonment to be in forcing him, through threats, etc., to come to Omaha; in detaining him in Omaha, both at the office and hotel; in the arrest by the Omaha detectives; the arrest by the Des Moines detectives and taking him to Des Moines; and undue delay in taking him before a magistrate after arriving in Des Moines.

Appellant made no motions relative to Count I until the motion was made for a new trial after the verdict. The court submitted but two incidents to the jury upon which a verdict of false imprisonment could be returned. In Instruction No. 6, the court said: "In other words, if the defendant company, through any officers or employee, caused plaintiff to be falsely imprisoned in either the Omaha or Des Moines city jail, and said imprisonment was false, then the defendant company would be liable for any damages resulting therefrom." Neither party questioned or objected to this submission, and, as far as this appeal is concerned, it is the law of the case.

Appellant asserts that the record conclusively shows that as to the Des Moines imprisonment it had nothing to do therewith. In so far as this goes to actual request or inducement leading to the action of the Des Moines detectives, there may be considerable merit therein. *However,* there was no motion to strike or withdraw this phase of the case from the jury. It was accepted as being sufficiently established in the record to warrant submission to the jury. The only question pertinent here, raised by the motion for a new trial, was that under the entire record, being both incidents submitted by the court, the verdict is contrary to and against the weight of the evidence. That such a motion is proper, even though there was no motion to direct

or to strike certain phases of the record, see Heiman v. Felder, 178 Iowa 740, 160 N.W. 234; Hansen v. Hough, 177 Iowa 93, 158 N.W. 501; In re Estate of Goretska, 234 Iowa 1080, 13 N.W.2d 432; Burke v. Reiter, 241 Iowa 807, 42 N.W.2d 907.

Whether the jury in arriving at its verdict based such upon the Omaha arrest or the Des Moines arrest or upon both we cannot say. Both were before it. If sufficient evidence was presented upon either incident then the verdict must stand so far as this proposition is concerned. There is no claim that appellee was not arrested in Omaha by the Omaha detectives; nor is it claimed that the arrest was made under or by virtue of any warrant, legal or otherwise.

Appellant cites sections 755.4 and 755.5, Code of 1950, which deal with arrests by peace officers and by private persons. It contends that if the Omaha transaction had transpired in Iowa, the arrest would have been legal; that presumably the Nebraska statutes are similar to Iowa statutes in the absence of a showing to the contrary. While this is an ingenious argument, we can find no merit therein. Clearly no crime had been committed in Nebraska. No charges against appellee had been filed in Iowa. Upon no conceivable theory under this record could an arrest in Omaha have been legal. Without again reviewing the record, which is fully set forth herein, we are satisfied that a finding of an illegal arrest, instigated by the appellant, is warranted thereunder and the overruling of the motion for a new trial upon this ground was proper.

V. Count IV alleges conversion of appellee's automobile by appellant. The record on this phase of the case is as follows: Appellee testifies that he drove his car to Omaha on the night of July 26, 1949, arriving about 2:30 a.m.; that he talked with Watson and was told to go to the hotel and return that afternoon. He stated: "I picked up my hat and my car keys were lying there on the desk. I started to pick them up and he said, 'No, I want them. I am going to lock your car up, make sure you don't leave town.' Watson got in it, and ran it into the garage. I have not seen it since." Watson states that appellee drove his car into the company garage and went to the hotel. Appellee further testified he has never asked appellant for his car. Recently he instructed his attorneys to refuse appellant's

tender thereof. It is stipulated that in August 1950 appellant, through its attorney, tendered the automobile to appellee, through his attorney. The tender was renewed in September 1950 and at the time of the trial. Each tender was refused.

Appellant's sole motion as to Count IV is for a new trial based upon the refusal of the trial court to give requested Instruction No. 7, and giving in lieu thereof Instruction No. 16. No exception was taken to Instruction No. 16, but it is claimed it does not adequately present appellant's theory of the case.

Instruction No. 16 told the jury before a recovery could be had on Count IV appellee must show appellant took his car against his will. Requested Instruction No. 7 was to the effect that if appellant took possession of the car rightfully and to accommodate the appellee, then he must show a demand for its return and a refusal before he can recover on this count.

While the requested instruction might well have been given, we are of the opinion that by the jury being told recovery could be had *only* if it found appellant took possession of the car against appellee's will, the rights of appellant were properly safeguarded. We find no error here.

VI. Another alleged error is that the verdicts returned on Count I and Count II were so excessive as to indicate passion and prejudice and the motion for a new trial should have been sustained.

As to Count I, the jury returned a verdict for $6500 actual damages and $6500 exemplary damages. As to Count II, the verdict awarded $6275 actual damages and $7000 exemplary damages. The trial court ordered a remittitur in each count as to actual damages of $3000, which was done. Thus the verdict from which appellant appeals is: Count I, actual damages $3500, exemplary damages $6500; Count II, actual damages $3275, exemplary damages $7000. In view of our holding on Count II above we need not consider the award as it applies thereto.

Both sides devote considerable time in argument upon this question. Both cite numerous authorities and all agree it is only where the verdict is so unconscionable as to show passion and prejudice that it should be disturbed. As to an award for actual damages when apparently excessive, we have, through

the process of requiring a remittitur, been able to properly adjust the award. This the trial court did. However, as to exemplary damages the rule is well established in this state that the proceeding of filing a remittitur is not applicable. Crum v. Walker, 241 Iowa 1173, 44 N.W.2d 701, and cases cited therein. While not involved here, but used merely as bearing upon the issue of passion and prejudice, the total award under Counts I and II, after a remittitur of $6000 actual damages, was for $20,275. In the main, the actual damages are the same under each count and, of course, the purpose of exemplary damages is the same, to wit, to punish the wrongdoer.

As the case was submitted to the jury the period of time during which appellee was held in custody was about twenty-four hours, being from the time of the arrest in Omaha until released on bail in Des Moines. Appellee, exclusive of the so-called confessions, admits the facts which caused the appellant to act, and denies only that a crime was thereby committed. While probable cause is not material upon the issue of false imprisonment, it is very important upon the issue of exemplary damages.

Under the record we are firmly convinced that award of $6500 exemplary damages is excessive to such a degree as to shock the conscience and shows passion and prejudice. The motion for a new trial as to Count I should have been sustained.

VII. Appellant also assigns as error the giving of Instruction No. 11, which has to do with the force and effect of the so-called confessions. This instruction is applicable only to Count II, as it pertains to the question of probable cause. In view of our holding as to Count II, supra, it is unnecessary to consider the same.

VIII. Now, as to appellee's cross-appeal: The trial court gave him the choice of filing a remittitur as to actual damages under Counts I and II, or a new trial. The remittitur was made and judgment entered for the total amount awarded, less the remittitur. From this judgment appellant appealed. Appellee now asserts that the court erred in requiring the remittitur and asks us to restore the original award. No authority is cited therefor, as is readily understood. While no Iowa authorities are found either way, such proceeding has been denied in at

least one other jurisdiction. See Lyric Amusement Co. v. Jeffries, 58 Ariz. 381, 120 P.2d 417; Rasmussen v. Milwaukee Elec. Ry. & Trans. Co., 259 Wis. 130, 47 N.W.2d 730; Rockafellow v. Streeter, 332 Mich. 366, 51 N.W.2d 249; and McDaniel v. Hancock, 328 Mich. 78, 43 N.W.2d 68. There is no merit to appellee's cross-appeal.

For the reasons above set forth the judgment as to Count I is reversed and remanded. As to Count II, the judgment is reversed and remanded with direction to enter judgment for appellant thereon. As to Count IV, the judgment is affirmed. Under the cross-appeal the judgment is affirmed.—Affirmed in part and reversed in part.

THOMPSON, C. J., and SMITH, MULRONEY, MANTZ, and WENNERSTRUM, JJ., concur.